**FREEDMAN NORMAND FRIEDLAND LLP**
Robert Dunlap (*pro hac vice forthcoming*)
1 SE 3rd Avenue, Suite 1240
Miami, FL 33131
Telephone: (786) 924-2900
Facsimile: (646) 392-8842
Email: rdunlap@fnf.law

**Forrester & Worth, PLLC**
2800 North Central Avenue, Suite 1200
Phoenix, Arizona 85004
John R. Worth (012950)
Byron H. Forrester (033877)
Telephone: 602.258.2729
Email: jrw@forresterandworth.com
bhf@forresterandworth.com

*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

| | |
|---|---|
| Paradigm Powerboats, Inc.; and Turbine Marine Inc., Florida Corporations,<br><br>Plaintiffs,<br>v.<br><br>Honeywell International Inc., a Delaware corporation,<br><br>Defendant. | Case No.:<br><br>**COMPLAINT**<br><br>**(Jury Trial Demanded)** |

Plaintiffs Paradigm Powerboats, Inc. and Turbine Marine Inc., (collectively "Turbine Marine" or "Plaintiffs"), for their complaint against Honeywell International, Inc. ("Honeywell"), hereby allege as follows:

## NATURE OF THE ACTION

1. This is a misappropriation, misrepresentation, and breach of contract action against Honeywell arising out of a confidential relationship with Honeywell and an accompanying Proprietary Information Agreement (the "PIA" or "NDA").

2. Upon information and belief, Honeywell has misappropriated confidential information and technology that Turbine Marine designed and developed, utilizing Turbine Marine's technical guidance, specialized know-how, and unique knowledge.

3. Turbine Marine brings this claim to rectify the harm to Turbine Marine that Honeywell has caused and continues to cause.

## PARTIES

4. Turbine Marine is a Florida corporation with its principal place of business in Pompano Beach, Florida.

5. Paradigm Powerboats, Inc. is a Florida corporation with its principal place of business in Pompano Beach, Florida.

6. Upon information and belief, Defendant Honeywell is a Delaware corporation with its principal place of business in Morris Plains, New Jersey.

## JURISDICTION AND VENUE

7. Honeywell's Aerospace operating segment conducts business in and, upon information and belief, is headquartered in Phoenix, Arizona.

8. This Court has jurisdiction over the subject matter of this Complaint, pursuant to 28 U.S.C. §§ 1331 and 1332, because the action arises under federal law, namely 18 U.S.C. § 1836, et seq., and because this action is between citizens of different states and the amount in controversy exceeds $75,000.

9. This Court has personal jurisdiction over Honeywell because Honeywell's Aerospace operating segment is headquartered in Phoenix, Arizona, and the Aerospace operating segment has its principal place of business in Phoenix, Arizona. Honeywell regularly transacts business in Arizona, regularly employs persons in Arizona, and regularly offers its goods and services in Arizona. Many of the events at issue took place in and/or were directed from Phoenix, Arizona. Further, some of the parties' agreements at issue provide that the federal or state courts sitting in Phoenix, Arizona will have exclusive jurisdiction of any dispute.

10. Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b)(2). Further, some of the parties' agreements at issue provide that the federal or state courts sitting in Phoenix, Arizona will have exclusive jurisdiction of any dispute.

## GENERAL ALLEGATIONS

11. Paradigm Powerboat, Inc. and Turbine Marine, Inc. (collectively "Turbine Marine" or "Plaintiffs") are Florida corporations that specialize in manufacturing turbine-powered generators, and direct-drive pump power systems.

12. Turbine Marine first began doing business by innovating the use of turbine-powered generators in high-performance speed boats but later transitioned to more profitable markets such as the defense and nuclear industries.

13. Turbine Marine now sells custom generators to, inter alia, the U.S. military including the U.S. Navy and nuclear plants.

14. Turbine Marine's principals and owners are John Arruda ("Arruda") and Kathleen Russo ("Russo").

15. Arruda came to realize that a specific engine that Turbine Marine has expertise with and a specialized knowledge of – a model known as the "T-55 Aviation Engine" or the "TF-40 Industrial Version" and its functional equivalents or analogues (hereinafter the "T-55") – could be used in the oil and gas industry as a source of power for direct drive pump fracking, and also for power generators for electric fracking or "e-frac" systems.

16. In the past, the fracking industry relied primarily on reciprocating diesel-fueled engines (which are relatively expensive). But in recent years, the industry transitioned to liquified natural gas ("LNG"), compressed natural gas ("CNG") and wellhead gas (a free byproduct of drilling), which is much more economical.

17. Turbine Marine began exploring the prospect of using the T-55 engine in the fracking industry and contacted numerous potential customers. However, the major oil and gas companies were only interested in contracting for T-55 engines in large volumes.

18. Understanding that the market for the T-55 in the fracking industry required the supply of large volumes, Turbine Marine began looking for an original equipment manufacturer (OEM) who could supply new T-55s in service of the oil and gas market.

19. Historically, the T-55 was used mostly for military aerospace in the CH-47 heavy-lift helicopters, it was not being manufactured at scale for industrial use, and the existing market consisted largely of refurbs and surplus inventory.

20. Turbine Marine contacted Honeywell in or around January 2020 with the concept of exploring a partnership in the oil and gas industry.

21. Turbine Marine (through Arruda) immediately requested an NDA to begin discussions.

22. Turbine Marine conveyed to Honeywell that "[t]he NDA was of primary importance."

23. In transmitting the NDA, Honeywell stated, "Please see attached a copy of the mutual PIA [Proprietary Information Agreement] in order to discuss the T55-714 turbine engines for portable generators sets program."

24. On January 17, 2020, Turbine Marine and Honeywell signed a Proprietary Information Agreement (hereinafter the "NDA") which recognized that:

> Each of the Parties possesses, or may possess, certain Proprietary Information (hereinafter defined) related to the T55-714 series gas turbine engines for portable generator sets ("Program") which the other Party may have a need to investigate the viability (cost, schedule, performance) of building gen sets with new T55 engines for oil & gas producers, direct drive pumps, generators for industrial use and other industrial end markets with respect to the Program. ("Purpose")[.]

25. After signing the NDA, Arruda (on behalf of Turbine Marine) also requested a contract to keep prospective clients confidential.

26. Arruda stated to Honeywell, "[i]t may also be helpful for us to have a client registration. This way we can talk openly about the projects we are currently negotiating, and the specifics on those individual projects."

27. In response Honeywell said, "Please note that per the PIA, we can't share any information to any third Party without your approval first. . . . Nonetheless, if you want to share the list of your clients and applications, we can amend the PIA in order to include them."

28. Turbine Marine relied on Honeywell's representation that "per the PIA, we can't share any information to any third Party without your approval first."

29. Shortly after initiating the discussions with Honeywell, in February 2020, Arruda became suspicious that Honeywell was talking with Ken Braccio of Advanced Turbine Services, LLC, ("ATS"). Ken Braccio ("Braccio") was Arruda's competitor in this specialized market.

30. Honeywell denied "having discussions with Mr. Braccio or ATS on licensing our T55-714s for industrial use" but later walked that back and said that "some casual discussions have occurred with Mr. Braccio."

31. Honeywell wanted Arruda to establish a "credible assessment of the market opportunity and our T-55s ability to compete in that market."

32. Arruda explained that, in Turbine Marine's conversations with established oil and gas companies such as Jereh Group, BJ Well Services, Nextier Company, those sorts of companies were not interested in anything less than approximately 1000 engines in a 5-year period. Each assembled product would sell for between $2.5-4.5 million, including gear boxes, control systems, etc., with potential profit margins of up to 50%.

33. To meet Honeywell's request for an assessment of the market opportunity, Turbine Marine submitted a formal "Industrial Gas Market Overview."

34. Shortly thereafter, Honeywell responded and stated:

> We completely agree that the market is there. We completely agree that the T-55 engine could work well in some industrial applications. But, we don't have any experience to make any forecast or judgment beyond that top-level assessment. In the new-engine game, we are all talking big dollars. You and us. That is where we play everyday, with all sorts of customers, serving all sorts of end markets, globally. We are good at that game.

> We look at you as an OEM customer in the industrial market, John. We only provide the engines, which are just a piece of the end product you build, market, sell and support to the end customers. Success, for us, is defined not by selling you engines, but rather by your company succeeding against the competition with those end customers. All of your suppliers should look at this opportunity that way. We only succeed if you succeed.

35. Turbine Marine (via Arruda) continued to share with Honeywell its prospective customers. For example, Turbine Marine relayed that Royal Dutch Shell via ShalePumps, LLC and Lime Instruments, LLC had indicated that they would need hundreds of assembled engines over the next 5 years.

36. The T-55 had previously not been considered a viable candidate for use by the oil and gas industry because prior case uses had been unsuccessful.

37. Turbine Marine, through its expertise and proprietary methods, knew that prior failures with the T-55 were due to certain errors in the adaptation designs of the T-55 installations and controls and was convinced that the T-55 would work in the fracking market.

38. Turbine Marine soon convinced some of the highest-level executives at Honeywell that this was a viable option.

39. From January 2020 through December 2021, Honeywell and Turbine Marine exchanged 426 emails. Many discussions were held and copious technical information was exchanged.

40. As discussions progressed, Honeywell continued to recognize the mutual NDA.

41. A PowerPoint prepared by Honeywell's Andrew Turner on July 15, 2020 was entitled "D&S Sales Opportunity Review." It contained a letter from Turbine Marine analyzing the potential market, rough notes on the potential opportunities, and it was designated confidential.

42. On October 15, 2020, Arruda again became suspicious that Honeywell might be talking with Braccio of ATS behind his back regarding the T-55 opportunity presented by Turbine Marine. In response, Honeywell assured that there were no such conversations: "We continue to respect the NDA."

43. Later in October 2020, Honeywell stated, "[W]e are messaging your inputs to our president and in turn our CEO. They are all aware of the potential here. . . . Just so you know we are actively working with potential partners to produce engines in large volume with a support base for the industrial sector beyond 2021."

44. In the middle of these discussions, the outbreak of COVID 19 caused a global pandemic and the oil and gas market went into a major recession. The price of oil plummeted; fracking demand dried up.

45. Technical conversations nevertheless continued through 2021. Numerous technical calls were held from January 2021 through July 2021.

46. For example, on April 22, 2021, a "Fracking Kit Parts List" was generated following calls with Arruda of Turbine Marine which Honeywell recognized was "for use under our mutual NDA."

47. In August 2021, Honeywell claimed that "for whatever reason we are not to do anything with adjacent markets like oil and gas or power generation with the T-55."

48. Honeywell's claim that "we are not to do anything with adjacent markets like oil and gas or power generation with the T-55" turned out to be totally false.

49. Just a few months after August 2021, Honeywell launched a partnership for use of the T-55 in the oil and gas industry.

50. On September 2021, Arruda wrote to Honeywell:

> I do not think the information below you have received about HW involvement adjacent markets is accurate.
>
> I was just informed by one of my clients, that Honeywell decided to team up with another competing group of companies financed by Morgan Stanley. This newly founded group is now going to offer NEW HW T-55 714A engines and parts in the oil and gas sector. They would be now competing with our sales efforts that we have laid the ground work for in this industry.
>
> I will spare you will all the details of this arrangement, as I know you are in technical sales. However, as I have now been miss-lead by HW, I will now be monitoring what is taking place with all my customers and referrals in this

> space, to see how the information and sales efforts I have given HW over the last year or so, will be used against our best interest.

51. On November 1, 2021, Honeywell announced that it was launching an oil and gas T-55 initiative:

> Honeywell (NASDAQ: HON) is partnering with Signal Power Group ("Signal Power" or "SPG") to expand the reach of Honeywell's storied T-55 turboshaft engine to include a new and innovative use in the industrial and marine end markets. The engine technology has been licensed to Signal Power, which will now be the original equipment manufacturer for new turbine drivetrains, that will, in part, be utilized in newly designed power generators. These new generators will bring lower emissions and greater versatility to customers. In support of the strategic relationship between Honeywell and Signal Power, investment funds managed by Morgan Stanley Energy Partners, part of Morgan Stanley Investment Management, have made a controlling equity investment in Signal Power.

52. Signal Power included Ken Braccio of ATS who Honeywell routinely reassured Arruda it was not talking with or feeding information to regarding Arruda's business proposals for the T-55 oil and gas plan.

53. Honeywell had assured that there were no such conversations with Braccio and stated, "We continue to respect the NDA."

54. Upon information and belief, prospective clients Arruda brought to Honeywell are being approached and poached by Signal Power.

55. Upon reading the November 1, 2021 Honeywell announcement, Arruda wrote an email demanding an explanation and stated "we still have an NDA, confidentiality agreement, non-compete, non-disclosure in place with HW to this day that is still enforceable."

56. Honeywell responded on November 18, 2021 and stated that it was "researching the details" and would "respond . . . upon completion of our internal review."

57. Arruda followed up on November 29, 2021, as he had still not heard anything.

58. On December 3, 2021, Honeywell stated:

> Honeywell has concluded its internal review of the agreements that we executed with Turbine Marine. We have reviewed the non-disclosure agreement (NDA) and do not agree that this document includes a non-compete clause nor are we aware of any other standalone non-compete agreement. We further disagree with the majority of the statements and characterizations included in your e-mail of November 16th related to Honeywell's interests in non- Aerospace markets for our T-55 engine. If you continue to maintain that Honeywell has acted in contravention to any agreement with Turbine Marine, please provide a copy of the agreement and any additional details that support your allegation.
>
> As part of our RFI process, Honeywell provided Turbine Marine with every opportunity to compete for this opportunity and, based on an evaluation of all relevant business factors, we elected to proceed with Signal Power Group for this opportunity. We appreciate Turbine Marine's interest in partnering with Honeywell, but we are not able to pursue any additional opportunities with Turbine Marine at this time.

59. Arruda sent a follow up email outlining the entire history with Honeywell and urging for a resolution.

60. Honeywell wrote to Arruda on December 17, 2021 and stated:

> We have reviewed the NDA and the press release and we can find no basis that Honeywell violated the terms of the NDA. Based upon this, Honeywell sees no further action relative to this issue.

61. Honeywell cut out Turbine Marine entirely.

62. Honeywell has recognized that it did not have the information required to enter this market prior to Turbine Marine's provision of economically valuable information.

## COUNT I

## INTENTIONAL MISREPRESENTATION

63. Plaintiffs re-allege and incorporate by reference the allegations of the preceding paragraphs of this complaint as if fully set forth herein.

64. As set forth above, Honeywell made untrue statements of material fact to Plaintiffs and omitted material facts necessary in order to make the statements not misleading in light of the circumstances under which they were made. Honeywell made statements with knowledge of their falsity, with knowledge that facts omitted were material,

and with reckless disregard as to their falsity. Honeywell made these statements with the intent that Plaintiffs rely on them to Plaintiffs' detriment and Plaintiffs did justifiably rely on them. As a result of Honeywell's misrepresentations, Plaintiffs have suffered damages.

65. Honeywell knowingly or recklessly, with intent to cause harm to Plaintiffs, caused employees and agents of Honeywell to make materially false and misleading statements, including but not limited to false statements that Honeywell could not "share any information" including information regarding prospective customers "to any third Party without your approval first"; that Honeywell was not engaging in discussions with Arruda's competitors; that Honeywell "continue[d] to respect the NDA"; and that Honeywell was "not to do anything with adjacent markets like oil and gas or power generation with the T-55."

66. Plaintiffs reasonably relied on these material false statements (collectively and individually) to their detriment, including, inter alia, insofar as Plaintiffs supplied their confidential and/or commercially valuable information to Honeywell based on these representations.

67. Plaintiffs' reliance on Honeywell's false representations was a substantial factor in causing the Plaintiffs' harm.

68. If Plaintiffs had known that Honeywell's representations were false, Plaintiffs would not have disclosed their confidential and/or commercially valuable information to Honeywell.

69. As a result of Plaintiffs' material misrepresentations and omissions, Plaintiffs have suffered damages.

**COUNT II**

**FEDERAL LAW MISAPPROPRIATION OF TRADE SECRETS (18 U.S.C. § 1836)**

70. Plaintiffs re-allege and incorporate by reference the allegations of the preceding paragraphs of this complaint as if fully set forth herein.

71. Plaintiffs' customer lists and technical expertise and proprietary methods with respect to the use of the T-55 in the fracking industry constitute trade secrets within the meaning of 18 U.S.C. § 1839(3).

72. Plaintiffs derive significant economic value from their trade secrets because they are not generally known to, and not readily ascertainable by, other persons capable of obtaining economic value from their disclosure or use within the meaning of 18 U.S.C. § 1839(3)(B). Plaintiffs have devoted substantial time, money, and resources to deriving economic value from their trade secrets by developing the technology for the oil and gas industry.

73. Upon and information and belief, Honeywell has improperly misappropriated Plaintiffs' trade secrets.

74. Honeywell knew or had reason to know that it acquired Plaintiffs' trade secrets by improper means, and/or disclosed or used those trade secrets without Plaintiffs' express or implied consent.

75. Honeywell's conduct was willful and malicious, without regard for Plaintiffs' rights, thus entitling Plaintiffs to an award of exemplary damages and attorneys' fees.

76. Plaintiffs are also entitled to recover damages from Honeywell for: (a) Plaintiffs' actual loss caused by the misappropriation of their trade secrets; and (b) any unjust enrichment obtained by Honeywell.

## COUNT III

## STATE LAW MISAPPROPRIATION OF TRADE SECRETS (A.R.S. § 44-401, et seq.)

77. Plaintiffs re-allege and incorporate by reference the allegations of the preceding paragraphs of this complaint as if fully set forth herein.

78. As adopted under A.R.S. § 44-401, et seq., the Uniform Trade Secrets Act prohibits trade secret misappropriation through improper means.

79. Plaintiffs' customer lists and technical expertise and proprietary methods with respect to the use of the T-55 in the fracking industry constitute trade secrets within the meaning of A.R.S. § 44-401.

80. Plaintiffs derive significant economic value from their trade secrets because they are not generally known to, and not readily ascertainable by, other persons capable of obtaining economic value from their disclosure or use within the meaning of A.R.S. § 44-401. Plaintiffs have devoted substantial time, money, and resources to deriving economic value from their trade secrets by developing the T-55 technology for the oil and gas industry.

81. Upon and information and belief, Honeywell has improperly misappropriated Plaintiffs' trade secrets.

82. Honeywell knew or had reason to know that it acquired Plaintiffs' trade secrets by improper means, and/or disclosed or used those trade secrets without Plaintiffs' express or implied consent.

83. Honeywell's conduct was willful and malicious, without regard for Plaintiffs' rights, thus entitling Plaintiffs to an award of exemplary damages and attorneys' fees.

84. Plaintiffs are also entitled to recover damages from Honeywell for: (a) Plaintiffs' actual loss caused by the misappropriation of its trade secrets; and (b) any unjust enrichment obtained by Honeywell.

**COUNT IV**

**UNFAIR COMPETITION**

85. Plaintiffs re-allege and incorporate by reference the allegations of the preceding paragraphs of this complaint as if fully set forth herein.

86. Based on the NDA and Honeywell's representations and assurances, Honeywell had access to Plaintiffs' confidential information.

87. Honeywell has unfairly competed against Plaintiffs by misappropriating Plaintiffs' confidential information.

88. Honeywell has taken Plaintiffs' confidential information for profit to use as its own, at little or no cost to Honeywell.

89. Such unfair competition and misappropriation of confidential information has caused damage to Plaintiffs in an amount to be proven at trial.

90. Honeywell's misappropriation, use, and disclosure of Plaintiffs' confidential information is contrary to honest practice in commercial matters.

91. Honeywell's unfair competition has caused and will continue to cause harm to Plaintiffs. Honeywell's acts of unfair competition will be ongoing unless the Court restores to the Plaintiffs the compensation which would inure but for Honeywell's unfair competition.

92. Honeywell acted willfully and maliciously, justifying an award of compensatory damages, punitive damages, and attorney's fees, in an amount to be proven at trial.

## COUNT V

## BREACH OF CONTRACT

93. Plaintiffs re-allege and incorporate by reference the allegations of the preceding paragraphs of this complaint as if fully set forth herein.

94. In exchange for adequate consideration, Honeywell and Plaintiff Paradigm Powerboats, Inc. entered into an NDA.

95. Honeywell agreed that it would "not use or disclose Proprietary Information except as permitted in this Agreement for 10 years from the expiration or termination date of the NDA."

96. Upon information and belief, Honeywell breached its NDA with Plaintiffs by, among other things, using Plaintiff's confidential information to develop and implement the T-55 for use in the oil and gas industry.

97. As a direct and proximate result of Honeywell's breach of the NDA, Plaintiff suffered and continues to suffer damages in an amount to be proven at trial.

## JURY DEMAND

98. Plaintiffs request a jury trial on all claims so triable.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for the following relief:

(A) That Plaintiffs be awarded full damages against Honeywell in an amount to be proven at trial, including but not limited to the full value of the trade secrets and confidential information that have been misappropriated;

(B) For damages specifically authorized under A.R.S. § 44-403(A) and 18 U.S.C. § 1836 (b)(3)(B), including both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss or, as an alternative measure of relief for trade secret misappropriation, by imposition of liability for a reasonable royalty for Honeywell's unauthorized disclosure or use of Plaintiffs' trade secrets;

(C) For exemplary damages for Honeywell's trade secret misappropriation pursuant to § 44-403(B) and 18 U.S.C. § 1836(b)(3)(C),;

(D) That Plaintiffs be awarded the costs of this action, including their costs in bringing this Complaint, and their attorneys' fees and litigation expenses pursuant to A.R.S. § 12-341.01(A) and A.R.S. § 44-404, as well as 18 U.S.C. § 1836(b)(3)(D);

(E) That Honeywell be ordered to return the confidential information and trade secrets of Plaintiffs' in Honeywell's possession;

(F) That Plaintiffs be granted punitive damages against Honeywell in an amount to be proven at trial; and

(G) That Plaintiffs be granted all other legal and equitable relief that this Court deems necessary and proper.

Dated: January 4, 2021

Respectfully Submitted,

**Forrester & Worth, PLLC**

*/s/ John R. Worth*
John R. Worth (012950)
2800 North Central Avenue, Suite 1200
Phoenix, Arizona 85004
Telephone: 602.258.2729
Email: jrw@forresterandworth.com

**FREEDMAN NORMAND FRIEDLAND LLP**

*/s/ Robert T. Dunlap*
Robert Dunlap (*pro hac vice forthcoming*)
1 SE 3rd Avenue, Suite 1240
Miami, FL 33131
Telephone: (786) 924-2900
Email: rdunlap@fnf.law

*Counsel for Plaintiffs*